# THE UNITED STATES DISTRICT COURT
## FOR THE
### WESTERN DISRICT OF WISCONSIN

**UNITED STATES,**
　　　　　**Plaintiff,**

　　　**v.**　　　　　　　　　　　**Case No.: 08-CR-107-BBC-03**

**BRYAN LEFEY,**
　　　　　**Defendant.**

### BRYAN LEFEY'S SENTENCING MEMORANDUM

Respectfully submitted February 23, 2009
Cornia Law, LLC
Attorney for Bryan Lefey

　　s/Reed Cornia
Reed Cornia
State Bar No.: 1038219

1213 N. Sherman Ave, Box 354
Madison, WI 53704
Office: 608.242.0098
Fax: 608.242.0098
reedcornia@cornialaw.com

TABLE OF CONTENTS

I.  INTRODUCTION ......................................................................................5
    A.  PURPOSES OF MEMORANDUM ...........................................................5
    B.  BACKGROUND ....................................................................................5
II.  DISCUSSION ........................................................................................14
    A.  GUIDELINE CALCULATIONS. .............................................................15
        i. THE DEFINITION OF TERRORISM UNDER §2332(B)(G)(5) SHOULD NOT BE TAKEN OUT OF THE STATUTORY CONTEXT OF "TRANSCENDING NATIONAL BOUNDARIES" .......................20
        ii.  THIS COURT MUST DETERMINE THAT EACH FACTOR GIVING RISE TO THE ENHANCEMENT BE PROVEN BEYOND A REASONABLE DOUBT, OR, AT LEAST, BY CLEAR AND CONVINCING EVIDENCE. ..................................................................................23
        iii. EVEN IF U.S.S.G § 3A1.4 APPLIES, THE DISTRICT COURT HAS THE DISCRETION NOT TO APPLY THE ENHANCEMENT IF, IN THE AGGREGATE, MITIGATING CIRCUMSTANCES TAKE THE CASE OUT OF THE "HEARTLAND" OF THE GUIDELINE. ..................26
    B.  18 U.S.C. § 3553(A) .........................................................................30
        i. NATURE OF THE OFFENSE. ............................................................31
        ii.  CHARACTER OF MR. LEFEY. .........................................................31
        iii.  MITIGATING FACTORS ................................................................32
III. CONCLUSION .......................................................................................33

Table of Authorities

**Cases**

*Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)......23, 24

*Bailey v. United States,* 516 U.S. 137, 144-45 (1995) .......................................................21

*CBS Inc. v. PrimeTime, 24 Joint Venture*, 245 F.3d 1217, 1222 (11th Cir. 2001) .............21

*Gall v. United States*, 128 S. Ct. 586, 594–95 (2007). ......................................................27

*Kimbrough v. United States*, 128 S. Ct. 558, 566–69, 574–75 (2007) ...............................27

*Koon v. United States* 518 U.S. 81, 92-93 (1996) ........................................................28, 29

*Platt v. Union Pacific Railroad Company,* 99 U.S. 48, 58 (1879) ....................................21

*Rita v. United States*, 127 S. Ct. 2456, 2465, 2468 (2007)................................................27

*United States v. Aranout*, 431 F.3d 994, 1001 (7th Cir. 2005) ....................................21, 24

*United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738 (2005 ........................................5, 26

*United States v. Canals-Jimenez,* 943 F.2d 1284, 1287 (11th Cir. 1991)..........................21

*United States v. Graham*, 275 F.3d 490, 517 (6th Cir. 2001) .....................................24, 26

*United States v. Hammoud*, 381 F.3d 316, 355 (4th Cir. 2004).........................................24

*United States v. Harris,* 434 F.3d 767, 773 (5th Cir. 2005)...............................................20

*United States v. Hopper,* 177 F.3d 824, 833 (9th Cir. 1999) ......................................25, 26

*United States v. Jordan*, 256 F.3d 922, 927-28 (9th Cir. 2001)............................24, 25, 26

*United States v. Kikumura*, 918 F.2d 1084, 1100-01 (3rd Cir. 1990)................................26

*United States v. Mandhai*, 375 F.3d 1243, 1247 (11th Cir. 2004).........................21, 29, 30

*United States v. Meskini*, 319 F.3d 88, 92 (2nd Cir. 2003) .................................................18

*United States v. Mezas de Jesus,* 217 F.3d 638, 643-45 (9th Cir. 2000) ...........................26

*United States v. Redemann*, 295 F. Supp. 2d 887 (E.D. Wisc. 2003)................................32

*United States v. Restrepo,* 936 F.2d 661, 667 (2d Cir. 1991) ............................................33

*United States v. Rivera*, 994 F.2d 942, 949 (CA1 1993)...................................................29

*United States v. Stuart*, 22 F.3d 76, 83-84 (3d Cir. 1994) ................................................33

*United States v. Valensia*, 222 F.3d 1173, 1182 (9th Cir. 2000) ..................................25, 26

*Witzke v. Femal*, 376 F.3d 744, 753 (7th Cir. 2004) ........................................................21

**Statutes**

18 U.S.C. § 1361 ...........................................................................................................15

18 U.S.C. § 2331 ...........................................................................................................22

18 U.S.C. § 2332b ................................................................................................. passim

28 U.S.C. § 991 ...........................................................................................................27

**Rules**

U.S.S.G. § 2B1.1 ...........................................................................................................15

U.S.S.G. § 3A1.4 ................................................................................................. passim

U.S.S.G. § 5K2.20 ........................................................................................................33

**Other Authorities**

Donald Worster, *Nature's Economy: A History of Ideas*, 2nd Ed. (Cambridge: Cambridge
    University Press, 1994).................................................................................................6

Friede Knobloch, *The Culture of Wilderness: Agriculture as Colonization in the
    American West*, (Chapel Hill, NC: University of North Carolina Press, 1996) ..........6, 7

James Willard Hurst, *Law and Economic Growth: The Legal History of the Lumber
    Industry in Wisconsin, 1836-1915*, (Madison, WI: University of Wisconsin Press,
    1984) ..........................................................................................................................7

Nancy Langston, *Forest Dreams, Forest Nightmares: The Paradox of Old Growth in the
    Inland West*, (Seattle, WA: University of Washington Press, 1995).........................6, 7

R.D. Nyland, *Silviculture: Concepts and Applications*, 2nd Ed. (The McGraw-Hill
    Companies, Inc. New York, 2002). .............................................................................7

Roderick Nash, *Wilderness and the American Mind,* 3rd Ed. (New Haven, CT: Yale
    University Press, 1982).............................................................................................6, 7

Samuel P. Hays, *Conservation and the Gospel of Efficiency*, (Pittsburgh, PA: University
    of Pittsburgh Press, 1999).........................................................................................7

Susan Zakin, *Coyotes and Town Dogs: EARTH FIRST! and the Environmental
    Movement*, (New York; Penguin Books, 1993).............................................................7

United States Sentencing Commission, Guidelines Manual ...........................................27

I.     INTRODUCTION

a.   Purposes of Memorandum

Bryan Lefey submits this memorandum in order to provide further information to the Court to assist it in reaching a sentence "sufficient but not greater than necessary" to achieve the statutory purposes of punishment, as required by 18 U.S.C. § 3553(a) and *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738 (2005).

*Booker* restored a district court's ability to fashion a sentence tailored to the individual circumstances of a defendant by requiring a court to consider factors other than the sentencing range prescribed by the United States Sentencing Commission. Indeed, under 18 U.S.C. § 3553(a), court must sentence below the range if such a sentence proves sufficient in achieving the purposes of punishment. *Booker* mandates a three-step process for determining a sufficient, but not greater than necessary, sentence.

First, a court should determine the applicable guideline range, resolving any factual disputes necessary to making that determination. Next, a court looks to whether, pursuant to the Sentencing Commission's policy statements, any departures from the advisory guideline range clearly apply. Finally, a court determines an appropriate sentence in light of the factors set out in 18 U.S.C. § 3553(a).

b.   Background

Wilderness has, for Americans, contradictory meanings. There are those, such as John Muir, Aldo Leopold, and Edward Abbey, who view wilderness as vital and important to humankind and more importantly vital in and of itself. There are also those, such as Gifford Pinchot, James Watts, and Ron Arnold, who view wilderness as an

5

obstacle to be overcome in the pursuit of wealth.  Additionally, the meaning of wildness continues to be hotly debated.  On one end of a sliding scale, there is the notion of untouched nature, free from the contaminating influences of humankind.  On the other end of the scale one finds the purely synthetic conditions that exist in a metropolis.   In between these two poles exists a wide array of meanings for "wilderness." [1]

The word "wilderness," itself, has evolved over time.  The word "wildness" as interpreted by the first Europeans to set foot in the Americas, proved different from the meaning of "wildness" or "wilderness" used by the first westward immigrants leaving St. Louis for California and Oregon.  Even now, wildness has many meanings.[2]

Of growing concern for many, is not just humankind's impact on nature and the natural world through encroachment and exploitation, but rather through the manipulation of the genetic code of plants and animals.[3]  This goes to the very heart of what "wildness" means.  The debate on the ethical use of genetic modification to "enhance" nature continues today, just as it did in the summer of 2000 when Bryan Lefey found himself in the center of this debate when approached by Ian Wallace and Daniel McGowan in late June of 2000.[4]

At an Earth First! meeting in Tennessee during late June or early July 2000, Ian Wallace and Daniel McGowan discussed vandalizing a silviculture project at the United

---

[1] Roderick Nash, *Wilderness and the American Mind,* 3rd Ed. (New Haven, CT: Yale University Press, 1982).

[2] Donald Worster, *Nature's Economy: A History of Ideas*, 2nd Ed. (Cambridge: Cambridge University Press, 1994).  *See also,* Nash, *Wilderness and the American Mind.*

[3] Nancy Langston, *Forest Dreams, Forest Nightmares: The Paradox of Old Growth in the Inland West*, (Seattle, WA: University of Washington Press, 1995). *See also,* Friede Knobloch, *The Culture of Wilderness: Agriculture as Colonization in the American West*, (Chapel Hill, NC: University of North Carolina Press, 1996).

[4] Knobloch, *The Culture of Wilderness.*

States Forest Service station located in Rhinelander, Wisconsin.[5]  Silviculture, defined as "applied dendrology," from the perspective of the Earth First! movement, as well as "mainstream" environmental groups, reduces trees to a commodity.[6]  From Wallace and McGowan's perspective, foresters, as producers of material for revenue, are only interested in the amount of production, the rate of production, how the "crop" progress, and how to influence production to reach the highest yield and profit, rather then the protection of the natural world for all to enjoy.  This is a view held by the vast majority of environmentalist, whether radical or mainstream.

Wallace and McGowan quickly brought together two more people, Katherine Christianson and Bryan Lefey (Rivera to the time) into their scheme.  Katherine had knowledge of the Rhinelander site, as did Ian Wallace.  The group made their plans and

---

[5] Proponents of wilderness have long considered the United States Forest Service as more interested in corporate interests and the maximization of profits then in the preservation of the nation's wild spaces.  Gifford Pinchot, who essentially founded and shaped the Forest Service, in a speech to the Society of American Foresters in March 1903, stated, "[t]he very object of our forest policy is not to preserve the forests because they are beautiful . . . or because they are refuges for wild creatures of the wilderness . . . but . . . the making of prosperous homes . . . . Every other consideration comes as secondary."  Samuel P. Hays, *Conservation and the Gospel of Efficiency*, (Pittsburgh, PA: University of Pittsburgh Press, 1999), 41-42.  *See also,* Knobloch, *The Culture of Wilderness*, 24, and Langston, *Forest Dreams, Forest Nightmares*, 108-13.  The break in preservation and conservation is traced to the ideological conflict between Pinchot and John Muir.  Nash, *Wilderness and the American Mind,* 131-40.  It is a conflict that continues to this day.  *See* Susan Zakin, *Coyotes and Town Dogs: EARTH FIRST! and the Environmental Movement*, (New York; Penguin Books, 1993).  For an interesting look at the lumber industry in Wisconsin and the role the law played, *see* James Willard Hurst, *Law and Economic Growth: The Legal History of the Lumber Industry in Wisconsin, 1836-1915*, (Madison, WI: University of Wisconsin Press, 1984).  It is a story of greed and loss, boom and bust.

[6] Silviculture includes the study of virtually every factor that influences the capacity to produce wood; from the "habits" of trees, their seed production rates, growth rates, reproduction, and trees reactions to differing soils, sunlight, and other climatic factors to disease, insects, and fire.  R.D. Nyland, *Silviculture: Concepts and Applications*, 2nd Ed. (The McGraw-Hill Companies, Inc. New York, 2002).  The amount of academic literature critical of the forest service and its mission over the last century is massive, and too much to list here.  Suffice it to say, for much, if not most of the forest services' history it has had a close relationship with industry.  The notion that the forest service represents the will of the people and is doing the people's work does not in fact play out in reality.  *See* Hays, *Conservation and the Gospel of Efficiency,* Knobloch, *The Culture of Wilderness*, 24, and Langston, *Forest Dreams, Forest Nightmares*, 108-13.

then Wallace, Christianson, and McGowan set off together for the St. Paul, Minnesota. Lefey made his own way to St. Paul.  (Gov't Disc. 50-53.)

In between the time the party took its direct action and arriving in St. Paul, McGowan and Christianson surveyed the Forest Service's facility in the Rhinelander area.  During this time, McGowan, Wallace, and Christianson continued to make plans, buy tools, and recruit a driver.  (*Id*.)

After the vandalism at the Rhinelander site, the group went their separate ways. McGowan and Christianson drafted and submitted the ELF statement.

c.  Bryan's Background.

Much as the word "wilderness" for Americans has meant different things at different times, Bryan's life has progressed and evolved.

Born in San Antonio, Texas on April 30, 1977 at the Robert B. Green Memorial Hospital, Bryan spent his early years pursuing art and other creative means of expression. Bryan, like everyone, had his small difficulties as he has sought to find meaning. Overall, though, Bryan has found his place in life and is loved and respected by those who know him.

Growing up, Bryan lived with his mother Hilda Perez. When he turned seven, he and his mother moved in with his paternal grandmother, Pauline Lagrone.  Prior to moving in with his grandmother, he and his mother lived in a series of apartment buildings in the San Antonio area.  His stay with his grandmother was his first truely permanent residence.

As a youngster, Bryan found himself drawn toward creative expression. In those earliest days he would often spend hours drawing with crayons and colored pencils.  He

particularly liked to watch Saturday morning cartoons, which sparked in Bryan an ambition to become an animator; seeing drawings brought to life left a strong impression on young Bryan.  Even today, Bryan still has a great deal of respect for animators.

In addition to his use of crayons and colored pencils, Bryan also built structures with cardboard boxes and empty cans.  He even experimented with making his own toys out of paper.  Inspired by the Transformers (mechanical toys that could change from one thing into another), Bryan would make paper planes that he could refolded into robot shapes.  While these self-made "transformers" never came out as well as he hope—he was only five after all—the toys impressed his family.

On another occasion, Bryan tried to make a working plane.  He fashioned an airplane from poster board and then affixed a homemade rocket to it.  The plane flew briefly, looping up into the air then crashing straight into the ground.  Bryan was excited the plane flew at all.

Bryan speculates that his impulse to build things may have been somehow inherited from this unknown father.   All Bryan has ever known of his father is his first name, Edward, and that he studied architecture at university.

Beyond his toy crafting, he has always enjoyed Halloween, especially as a child.  The creativity involved in making costumes particularly interested Bryan.  Bryan's mother, herself quite creative, often helped Bryan realize the Halloween costumes he had envisioned.  She taught him how to sew as well as how to create special effects using makeup.

After the fifth grade Bryan and his mother moved out of his grandmother's house.  They moved into an apartment complex across town.  Bryan struggled adjusting to this

completely new environment.  The family moved because his mother felt it was important for Bryan to attend Middle School and High School in a school district with better funding.   Despite his great effort adjusting, Bryan believes this was a wise move and is still grateful for it.

In the seventh grade Bryan discovered skateboarding.  He spent many afternoons with friends skating and reading skateboard magazines.  During this period, his drawing shifted to design work.  Bryan would copy company logos, focusing on the way the colors and words fit together.  Through this process, Bryan learned a lot about how the eye perceives shape and color.

In Middle School, Bryan's elective courses focused on creative endeavors.  He took classes in theater, drafting, blueprinting and photography and woodshop.

In High School Bryan continued to take elective course focused on art and design. He took photography for two years, and woodshop for three years.  Bryan also took two years of Latin.  Today, Bryan laments the fact that he did not pay more attention in Latin because he has taken an interest in reading Medieval and Renaissance manuscripts, many of which are written in Latin.

It was also during High School that Bryan began sewing, dabbling a bit in making his own clothes and experimenting with modifying clothes he already had.  He received extensive advice from his mother when it came to troubleshooting.  His interest in sewing during High School foreshadowed an important element of what later on developed into what Bryan describes as "an intrinsic aspect of my lifestyle: clothing design."  Even now, his passion for clothing design is ever developing.

Music proved another interest for Bryan.  During and after High School he

performed in a couple bands.  This was the beginning of his interest in performance art. He found the performance aspect as interesting if not more so then simply playing music. The first band did not last long: it only played one gig.  Around twenty or twenty-one he joined his second band.

It was with the second band that Bryan began working with the idea of conveying "textures" rather than melody as well as conveying images within the sounds the band produced.  As performers the ensemble embodied the images it created.  The group played improvisational, so, as Bryan noted, "it was interesting to note the different types of sound we created depending on who in the band was playing which instrument." Around this time, Bryan discovered the therapeutic aspects of music and performance for not only those of participating in the act, but also those in attendance.

Bryan also started making jewelry out of found metal objects during this period of his life.  Making jewelry expanded on his architectural fascination.  He developed various styles of chain links using nails bent with a set of modified hand tools. (see attached pictures).

Bryan participated in this second band until he left San Antonio for the West Coast. He left his hometown because he felt he needed to move on to the next phase of life.  He arrived in Seattle, Washington, September 1, 1999 at the age of twenty-two, without knowing anybody.  Bryan found a temporary job a week or two after arriving, but it took a couple months to find a stable home. During this early period in Seattle, Bryan spent his nights in Myrtle Edwards Park with the occasional stay at the International Hostel to shower and cook hot meals.  After a couple of months, a room opened up for rent at a new friend's house.

During this early period in Washington, he played music with various individuals but nothing really lasted until he joined a drumming ensemble.  This occurred as he approached twenty-four years old.  As noted by Bryan, "I learned much about different styles of rhythm from all over the world."  This experience expanded his knowledge of rhythm and has carried into his current music projects.

Around this same time, Bryan was approached by a friend, and locally renowned Butoh dancer, he asked Bryan to participate in a performance that his troupe, named PAN was about to do.  The piece PAN would perform found its inspiration through a black and white Japanese film called *Woman Of The Dunes*.  When he was first approached he was intimidated by his lack of dance experience.  In fact, Bryan warned his friend and the troupe, how frigid his dancing could be and how he lacked any sort of training in dance.  Despite his warnings, the group convinced Bryan that they thought that he would make a good candidate for training.  The troupe was trying to find people with no formal training in dance so that the group could initiate their own curriculum on "fresh bodies."

This idea of training non-dancers was started by one of the first Butoh dancers, Tatsumi Hijakata.  What Hijakata did in the 1960s was to train people of different body shapes, dancing in the same form, for the purpose of seeing how the different body types responded to the same set of instructions.  This group that recruited Bryan was composed of individuals of various disciplines.  Each of the various disciplines would take turns leading the entire group.

Despite his initial hesitation, Bryan jumped into something he had never done before.  Through his work with PAN, Bryan overcame his fears and participated enthusiastically.  The first performance he participated in was a bit rough; nevertheless,

the group encouraged Bryan to continue.  Training was rigorous and he learned a lot about choreography, stage sets, lighting and how music can contribute to a dance.  Bryan also learned about costumes and how they affect not only the movement of the person wearing it, but also how it affects the audience.  Bryan continued participating with PAN for about a year or so, until he realized he and the group were beginning to move in different directions as far as approach and aesthetic were concerned.

Around the same time that Bryan was working with PAN he began taking weekly dance classes with a woman named Joan.  Though he was broke at the time, Joan allowed him to continue taking the course.  Bryan did what he could to show up every week and complete her course.  He did not miss a single class.  Some time after the workshop series ended, in May of 2002, Joan rounded up Bryan and others for an ensemble performance entitled *5000 Falling Soul*s.  This performance was inspired a trip Joan took to Manhattan in the wake of 9/11.  After months of rehearsal, the group performed this piece before the public for two weeks.

During all this time Joan was also having monthly performances at her house.  She essentially turned her living room into a stage.  Joan recruited Bryan as her lighting person, so once a month he would spend the better part of a weekend at her house where he would set up the stage, run the performances for two nights, then tear it down and return her living room back into a normal state.  There was never any money to be made, but he enjoyed eating his hostess' delicious food.

Through Joan, Bryan met a lot of other international Butoh dancers. Talented people from Germany, Thailand, Japan and other parts of the United States, each with different philosophies about Butoh, which helped to give him a well-rounded perspective

13

on this art form.  Often these guests would give intensive workshops and despite how broke he was, because of his position as a lighting person for their performances he was able to participate in these workshops and learn a lot about dance.  This continued until Joan and her husband left overseas.

Also during this time period, Bryan worked with a group called the Degenerate Art Ensemble, who produce elaborate performances involving dance and live music. Bryan did costume design and makeup for a couple of their major productions. (see attached photos) Again, he did not make any money but the reward was invaluable.  All of these experiences really helped to shape his direction in artistic performance.  He learned a lot about all aspects of what goes into a performance piece.

In January of 2005, Bryan debuted his first solo dance performance. All choreography, costumes, sound, lighting design and set design were of Bryan's creation. From this point onward, Bryan has primarily focused on solo work. (see photos.) Looking back on his creative life Bryan reflects in his development as an artist, "seeing how things I've done in my younger days have contributed to what it is I'm doing with my life nowadays.  Instead of making toys out of paper I design CD envelopes for my audio releases."  (see attached photos.)  A focus on vivid imagery is prevalent in his dance, music and design work.  There is a therapeutic aspect in all his work as well as in his way of living.  "These days," as noted by Bryan, "for instance, despite—or perhaps because of—my current legal predicament, I'm still trying to put as much focus as possible into my artistic endeavors."

II.    DISCUSSION

a.   Guideline Calculations.

Mr. Lefey pled guilty to count two of the Indictment charging him with violating 18 U.S.C. § 1361. The pre-sentence report writer, in calculating his guideline range as 151 to 188 months, applied a fourteen-point enhancement based on the loss amount pursuant to U.S.S.G. § 2B1.1(b)(1)(h) and an additional twelve point enhancement pursuant to U.S.S.G. § 3A1.4 based on the overly broad definition of a crime of terrorism.  In addition, U.S.S.G. § 3A1.4 requires a criminal history category of VI.

Simply stated, Bryan Lefey is not a terrorist.  Nor should he be considered a terrorist and he certainly should not be treated as one.  He committed a crime and for this he knows punishment must occur.  But under any legal definition or common sense usage of the word, or for any practical reason, Mr. Lefey is not a terrorist.

Contrary to what the government may argue and the political policies pushing for this treatment, Bryan Lefey is not a terrorist. (see att. Law Article)  No one can doubt the wrongfulness of his conduct on July 20, 2000.  He and his co-defendants damaged and destroyed United States Forest Service property.[7] Without ceding to the political winds,

---

[7] While counsel for Mr. Lefey is aware the Court has made its determination of monetary loss for the vandalism committed and does not dispute this for purposes of sentencing, the loss amount— or more accurately the reasoning provided by the United States Forest Service—proves concerning.  First, Black Cottonwoods, or California Poplars, as they are also known, start flowering at ten years; the Forest Services stated the trees, planted in 1983, had just reached flowering age—apparently seven years later then normal—in 2000.  Second, the project that had been damaged had been completed in 1993 (again, the flowering age is ten years), so this makes sense.  While the trees had been left and maintained, no scientific research had gone into the trees from roughly 1993 to 2000.

Additionally, Black Cottonwoods, like all varieties of cottonwoods and related trees, prove difficult to kill (ask anyone how has dealt with cottonwood overgrowth along rivers and creeks.  Cottonwoods have high levels of rooting hormones and due to this sprout readily.  Even after logging operations, Black Cottonwoods can and do regenerate naturally from rooting of partially buried fragments of branches, from stumps left behind, and from the roots themselves. Black Cottonwoods also have the ability to abscise shoots complete with green leaves that root

and without stretching the law to embrace the conduct for which Mr. Lefey is
responsible, this Court should not find that he is subject to the terrorism enhancement.

Bryan Lefey's actions on July 20, 2000 stemmed from his youthful passions. His
motivation centered on protection of the natural world and its diversity.[8] Bryan, like so
many young political activists, wanted to make the world a better place for nature and
humankind. And like so many young people, passion and impatience supplanted reason.
Granted, his acts were ones of desperation and an overwhelming feeling of despair, but
his only motivation was the hope of saving our earth from destruction and degradation.
*See e.g., The Rise and Fall of the Eco-Radical Underground*, Rolling Stone Magazine,
August 10, 2006 p. 73).

While the tactics at Rhinelander, in which he found himself embroiled, proved
misguided, his intention centered on drawing attention to the misconduct he perceived—

---

where they land or get dispersed through water transport or other means. In fact, this is how
Black Cottonwoods can colonize new areas—even exposed sand bars. As a starting point, *see*
http://en.wikipedia.org/wiki/Populus_trichocarpa.

Because the trees tend to sprout and grow rapidly, the trees "killed" in the vandalism of
July 20, 2000, most likely sprouted and sent off new shoots, thus preserving the genetic attributes
that the Forest Service selected. Moreover, had the trees been maintained after the vandalism, the
new sprouts would have reached or would soon reach maturity. But, more then likely, with no
real interest in the Black Cottonwoods (again this grove sat for seven years before Mr. Lefey and
his co-defendant's direct action), the trees, even if they had not been damaged would not have
generated any more interest or funding for the Rhinelander Research Station.

The paucity in funding for "new" research on the Black Cottonwood is because the
species is considered a model organism in plant biology and is one of the more researched trees
due to its rapid growth characteristics and size. In fact, its full genome was sequenced in 2006—
the first tree species to be sequenced. There were reasons, the Rhinelander station did not
continue further research on its grove of cottonwoods—the tree has been studied and crossbred
and worked with since almost the beginning of silviculture in the Western United States.

In essence, the Black Cottonwoods in this case can be compared to a 1983 Chevrolet
Chevette, used till 1993 and then put aside in a dry barn, started every so often, but never used
until it was stolen in 2000. Would it be reasonable to set restitution at the 1983 purchase price or
the actual value of the car in 2000? *See* http://en.wikipedia.org/ wiki/Chevrolet_Chevette.

[8] Those who identify with Earth First! generally believe the tenants of Deep Ecology, a
philosophy that takes into consideration the intrinsic value of all life. In a nutshell, and probably
much too simplified, a Sego Lilly has as much right to exist as a wolf or a human.

commercialism and moneyed interests over biodiversity.  The action Mr. Lefey

participated in corresponded directly with the misdeeds and injustice Mr. Lefey and his

co-defendants felt industry inflicted on the natural world.

Bryan lived and continues to live as an individual who never sought to cause

injury or harm to any living creature.  And he would not put himself in a position where

his actions could physically harm someone.  Other then participating in protests, for

which he received the usual harsh treatment law enforcement seems to think necessary to

quell dissent, the Rhinelander action was Mr. Lefey's only direct action.[9] The methods

used were misguided, but these were not acts of terrorism. None of the actions and actors

now before this court ever engaged in any activity in which the aim was to injure any

individual. Moreover, no harm ever occurred to anyone, and has never occurred in the

history of ELF actions.

Terrorist acts center on hate and foremost to generate fear.  A terrorist seeks to

create an environment in which the populace lives in fear; in which the institutions of

government are moved to redirect resources and the patterns of personal behavior are

altered.  A terrorist's goal is to cause death, because death is the ultimate tool.  Death is

the ultimate source of fear.  Hatred is the motive.  A terrorist has contempt for the lives of

his enemies.  The terrorist wishes only the death and the destruction of his enemy and

their institutions and government.

The government, and in particular the former Bush Administration's, use of the

---

[9] Despite the hyperbole of the Right—the "wise use" movement, politically right-winged
congresspersons and senators, and the Department of Justice, Earth First! and "ELF" direct
actions have never harmed or killed anyone.  On the other hand, law enforcement has used
excessive force and condoned (at least refused to prosecute anyway) the acts of reactionaries that
have actually killed environmentalist.

term "eco-terrorism" and their efforts to tie these actions to domestic terrorism proves misplaced. Essentially, the government seeks to place the actions of a loose group of environmental activists on par with Timothy McVeigh, and Al Qaeda. Even Ted Kaczynski was not considered a terrorist.

The goal of labeling an individual a terrorist and imposing the terrorism enhancement is to impose a sentence of sufficient length and require terms of confinement of such harshness that these individuals will be safely locked away from society so that the beliefs and goals of the terrorist are unable to cause further harm. The underlying presumption is that such an individual possesses an on going threat to society that cannot otherwise be deterred. Bryan Lefey is not such an individual.

In *United States v. Meskini*, 319 F.3d 88, 92 (2nd Cir. 2003), the Second Circuit held that Congress and the Sentencing Commission had a rational reason for creating U.S.S.G § 3A1.4, "[b]ecause terrorists . . . are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation and the need for incapacitation . . . ." Even if the Court presumes Mr. Lefey is guilty of terrorism, which counsel maintains he is not, none of the aforementioned reasons stated by Congress or the Sentencing Commission apply to Mr. Lefey. The likelihood of recidivism is most minimal; Mr. Lefey lived almost eight years from the time of his action until his arrest without engaging in any activity similar to that with which he is charged. During this time, Bryan has worked and lived an interesting and aesthetic life centered on music and performance art. He has maintained this life through various employments, most in the service industry.

As for the "difficulty of rehabilitation," counsel again notes, one merely need to look at his life following his participation in the in Rhinelander direct action to see that

Bryan has fully and successfully turned his life around.  Mr. Lefey found peaceful and lawful ways to help others, particularly through his performance art and music.  Clearly, Mr. Lefey turned his life around and is not one who will face the "difficulty of rehabilitation."

With regard to the need for incapacitation, Mr. Lefey' last eight and a half years of living quietly, peacefully and productively in the community is proof positive there is no need for such extreme incapacitation.  No one can counter the positive impact Bryan's life has had on others.  *See e.g.*, the letters of support.  Due to the punitive nature of the guidelines, Mr. Lefey will serve prison time for the role he played in Rhinelander in 2000; nevertheless, he has already proven to himself, to the community and to this Court, that "incapacitation" to prevent further criminal activity is neither necessary nor applicable.  Again Bryan Lefey is not a terrorist and U.S.S.G. § 3A1.4 should not apply to him.

The application of U.S.S.G. §3A1.4 has been selectively and discriminately applied across the country, as evidenced by the failure to apply the enhancement in *United States v. Cloyd, United States v. DeBusk* and *United States v. Moseley*, the recent Alabama church arson cases. The enhancement was not applied in the serial arson case of *United States v. Meredith* involving approximately three-dozen fires set on federal land requiring more than 600 fire fighters.  The enhancement has not been applied to KKK arsons or abortion clinic bombings.

Three distinctly critical issues raised by the application of U.S.S.G. § 3 A1.4 need addressing.  First, for U.S.S.G § 3A1.4 to apply a defendant must be convicted of a crime enumerated in 18 U.S.C. § 2332b, ACTS OF TERRORISM TRANSCENDING NATIONAL

BOUNDARIES and a court cannot ignore the context of the statute as a whole.  Second, this court must require proof of each factor giving rise to an application of U.S.S.G. § 3A1.4 beyond a reasonable doubt, or at the very least, by clear and convincing evidence.  Finally, even if this Court determines that U.S.S.G § 3A1.4 technically applies to Bryan Lefey, the Court has the discretion, authority, and support of the United States Supreme Court to refuse to apply the enhancement in cases such as this one, where the facts take the case out of the heartland of U.S.S.G § 3A1.4.

i. THE DEFINITION OF TERRORISM UNDER §2332(B)(G)(5) SHOULD NOT BE TAKEN OUT OF THE STATUTORY CONTEXT OF "TRANSCENDING NATIONAL BOUNDARIES"

The *Harris* case addressed the issue of whether the Sentencing Commission could carve the statutory definition of a federal crime of terrorism out of the context of the statute as a whole.  Title 18 U.S.C. §2332(b) pertains specifically to "Acts of Terrorism that Transcend National Boundaries."  In *Harris,* the Fifth Circuit held that:

> The definition of a "federal crime of terrorism" in 18 U.S.C. § 2332b(g)(5), . . . encompasses many offenses, none of which has as an element requiring conduct transcending national boundaries.  All that section U.S.S.G. § 3A1.4 requires for an upward adjustment to apply is that one of the enumerated offenses was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.

*United States v. Harris,* 434 F.3d 767, 773 (5th Cir. 2005).

The holding in *Harris* is incorrect.  The definition provided in 18 U.S.C. § 2332b(g)(5) cannot be incorporated into U.S.S.G. § 3A1.4 out of context of the entirety of the statute.  To do so would impermissibly ignore the full text of 18 U.S.C. § 2332b, discarding words as meaningless or surplus.  As noted in *Aranout,* **"The Guidelines must be interpreted, however, so *no words are discarded as meaningless, redundant or**

*surplusage*." *United States v. Aranout,* 431 F.3d 994, 1001 (7th Cir. 2005), citing *Witzke v. Femal,* 376 F.3d 744, 753 (7th Cir. 2004) (finding that this court must read a statute to give effect to each word so as to avoid rendering any words meaningless, redundant, or superfluous).

Traditional rules of statutory construction require that every term should be construed as having a meaning.  In drafting statutes, Congress is presumed to have used no superfluous language.  *Platt v. Union Pacific Railroad Company,* 99 U.S. 48, 58 (1879).  *See also Bailey v. United States,* 516 U.S. 137, 144-45 (1995) (holding each term used by Congress is presumed to have a "particular, non-superfluous meaning.")

The Eleventh Circuit also recognizes the longstanding, traditional rule of statutory construction.  In *Mandhai,* the court held:

> We must interpret a guideline "so that no words shall be discarded as being meaningless, redundant, or mere surplusage." *United States v. Canals-Jimenez,* 943 F.2d 1284, 1287 (11th Cir. 1991).  A guideline's meaning is derived first from its plain language and, absent ambiguity, no additional inquiry is necessary.  *CBS Inc. v. PrimeTime, 24 Joint Venture,* 245 F.3d 1217, 1222 (11th Cir. 2001).

*United States v. Mandhai,* 375 F.3d 1243, 1247 (11th Cir. 2004).  Based upon the holdings of the United States Supreme Court, in addition to the Seventh and Eleventh Circuits, there is no choice but to read the definition of a Federal Crime of Terrorism in the context of 18 U.S.C. § 2332b as a whole.  Any factor used to apply U.S.S.G § 3A1.4 must connect to an intent to promote a terrorist act, or terrorist actions that transcend national boundaries.

According to the reasoning in *Aranout* and *Witzke*, the Sentencing Commission, in choosing to use the definition contained in 18 U.S.C. § 2332b(g)(5), must have intended that the conduct in question somehow transcend national boundaries.  In fact,

the Sentencing Commission subsequently expanded the definition of federal crimes of

terrorism, using the statutory definition of terrorism under 18 U.S.C. § 2331(5),

pertaining to "Domestic Terrorism."  This provision, under 18 U.S.C. § 2331, casts a

much wider net over the types of activities Congress considered domestic terrorism.

The term "Domestic Terrorism," under 18 U.S.C. § 2331(5), is defined as

activities that:

> (A) involve acts dangerous to human life that are a violation of the
> criminal laws of the United States or of any state;
> (B) appear to be intended –
> (i) to intimidate or coerce a civilian population;
> (ii) to influence the policy of a government by intimidation or coercion; or
> (iii) to affect the conduct of a government by mass destruction,
> assassination
> or kidnapping; and
> (C) occur *primarily within the territorial jurisdiction of the United States*.

18 U.S.C. § 2331(5). (Emphasis added).

If U.S.S.G. § 3A1.4 is understood in the context of 18 U.S.C. § 2332b as a whole,

defining terrorist crimes as those which transcend national boundaries, the congressional

intent behind the statute, and thus the intent of the Sentencing Commission, was to

enhance the sentence of defendants who have been convicted of acts of international

terrorism, whereas 18 U.S.C. § 2331(5) expressly addresses and concerns domestic

terrorist activities. Clearly, under a plain reading of the two statutes, had Congress and

the Sentencing Commission intended to encompass such a broad class of crimes and

defendants, as they later did, they would have supplied the definition in 18 U.S.C. §

2331(5) instead of 18 U.S.C. § 2332b(g)(5).

The intent behind the 1996 amendments to the enhancement was to encapsulate

criminal acts that have an affect on government conduct.  In the advent of the Oklahoma

City bombing, Congress was concerned with more than just the destruction of government property. In enacting the 1996 AEDPA, (Public Law 104-132; codified in 18 U.S.C. § 2332b(g)(5)(A)), the concern of Congress was ensuring that defendants like Timothy McVeigh have no chance in the future to continue to pursue ideologically based terrorist attacks risking death and bodily injury and threatens our nation's security and the proper function of government.

What Congress and the Sentencing Commission did not envision, were defendants like Bryan Lefey, defendants with no history of association with international terrorist cells, defendants who, for a short period of their lives, were vulnerable to a rhetoric that persuaded them to engage in wrongful activities, activities they never would have been involved in absent the pressure of others.

Even if a definition can be taken out of context of an entire statute, the intent of the Sentencing Commission as described above remains the same. Mr. Lefey is not the type of defendant envisioned by U.S.S.G. § 3A1.4 and this court has the discretion to find this to be an extreme case where the defendant's circumstances take him out of the heartland of the guideline.

ii. THIS COURT MUST DETERMINE THAT EACH FACTOR GIVING RISE TO THE ENHANCEMENT BE PROVEN BEYOND A REASONABLE DOUBT, OR, AT LEAST, BY CLEAR AND CONVINCING EVIDENCE.

This Court must apply the appropriate standard of proof of each fact giving rise to the application of the enhancement. Regarding general enhancements, under *Apprendi*, each fact not admitted to by a defendant that results in the enhancement of a sentence must be proven to a fact finder beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Despite the ruling in *Apprendi,* the

current standard of proof required for application of U.S.S.G. § 3A1.4 varies between the circuits.  Despite minor variations, the circuits have adopted inappropriately low standards for proving facts that serve to enhance a defendant's sentence.

These standards are particularly low in light of *Apprendi*.  The Seventh Circuit, following *Graham,* has adopted a mere preponderance of the evidence standard to prove the intent to promote a federal crime of terrorism.  *United States v. Aranout*, 431 F.3d at 1002, citing *United States v. Graham*, 275 F.3d 490, 517 (6th Cir. 2001).  The *Graham* opinion is noteworthy here, not because of the majority holding but, more importantly, because of the arguments by the dissent against such a low standard of proof: "[e]nhancement of some 250 months requires more than a finding by a preponderance of the evidence. At a minimum, the evidence should be clear and convincing if not beyond a reasonable doubt."  *United States v. Graham,* dissenting opinion, 275 F.3d at 525.

The dissent in *Graham* is not the only place where the Court may find arguments supporting a more stringent standard of proof.  The Fourth Circuit, in contrast to *Graham* and *Aranout*, discussed the Ninth Circuit's adherence to a higher standard of proof: "[i]n contrast, the Ninth Circuit has imposed a heightened standard of proof in a number of cases.  *See, e.g., United States v. Jordan,* 256 F.3d 922, 927-28 (9th Cir. 2001) (noting that the court has applied a heightened standard of proof for seven-level and nine-level enhancements and articulating 'totality of the circumstances' test for determining whether heightened standard should apply."  *United States v. Hammoud*, 381 F.3d 316, 355 (4th Cir. 2004).

The Ninth Circuit has held that when a sentencing factor has an "extremely disproportionate effect" on the sentence relative to the offense of conviction, due process

requires that the government prove the facts underlying the enhancement by clear and convincing evidence. *United States v. Hopper*, 177 F.3d 824, 833 (9th Cir. 1999).

In determining whether a sentencing enhancement will have a disproportionate impact on the sentence as compared to the offense, the Ninth Circuit has not, "set a bright-line rule for the disproportionate impact test. Instead, we have looked at the 'totality of the circumstances,' without considering any one factor as dispositive." *United States v. Jordan,* 256 F.3d at 928.

In *United States v. Valensia*, the Ninth Circuit listed several factors relating to disproportionate effect. These include:

> (1) whether "the enhanced sentence fall[s] within the maximum sentence for the crime alleged in the indictment;"
> (2) whether "the enhanced sentence negate[s] the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment;"
> (3) whether "the facts offered in support of the enhancement create new offenses requiring separate punishment;"
> (4) whether "the increase in sentence[is] based on the extent of a conspiracy;"
> (5) whether "the increase in the number of offense levels [is] less than or equal to four;" and
> (6) whether "the length of the enhanced sentence more than double[s] the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence.

*United States v. Valensia*, 222 F.3d 1173, 1182 (9th Cir. 2000), *cert. granted*, judgment vacated, and remanded by 121 S.Ct. 1222 (2001).

Situations where the Ninth Circuit found sentences to have a disproportionate impact, requiring the sentencing court to find the facts leading to the enhancement by clear and convincing evidence are as follows: Cases where "a seven-level adjustment increased the defendant's sentencing range from 24-30 months to 63-78 months. . . ."

*United States v Hopper*, 177 F.3d at 833.  In *Mezas de Jesus*, the Ninth Circuit reaffirmed *Hopper* and held that a "nine-level enhancement on the grounds that he committed a firearm offense during an uncharged kidnapping," warranted the clear and convincing evidence standard. *United States v. Mezas de Jesus,* 217 F.3d 638, 643-45 (9th Cir. 2000).

In contrast, situations in which the Ninth Circuit has not found a disparate impact based upon the sentencing enhancement include: "four-level increase in sentence is not an exceptional case that requires clear and convincing evidence."  *United States v. Jordan,* 256 F.3d at 927; *United States v. Kikumura,* 918 F.2d 1084, 1100-01 (3rd Cir. 1990); *United States v. Valensia,* 222 F.3d at 1182.  As a result, the Ninth Circuit in *Valensia* found that the defendant "was not deprived of due process when the district court determined the facts pertinent to the enhancements pursuant to the preponderance of the evidence standard." *United States v. Jordan,* 256 F.3d at 928 citing *United States v. Valensia,* 222 F.3d at 1183.

The *Valensia* and *Jordan* decisions, combined with the vehement dissent in *Graham*, provide the Court with adequate support to require at least proof of each factor giving rise to the terrorist enhancement by clear and convincing evidence. This is true whether or not Mr. Lefey admitted to those factors because the sentence, enhanced by U.S.S.G. § 3A1.4, results in the disparate impact.

iii. EVEN IF U.S.S.G § 3A1.4 APPLIES, THE DISTRICT COURT HAS THE DISCRETION NOT TO APPLY THE ENHANCEMENT IF, IN THE AGGREGATE, MITIGATING CIRCUMSTANCES TAKE THE CASE OUT OF THE "HEARTLAND" OF THE GUIDELINE.

Since *Booker*, the Supreme Court has clearly stated that 18 U.S.C. § 3553(a) governs sentencing decisions, and that the guidelines are advisory. Sentencing judges may now consider arguments that specific guideline provisions fail to properly reflect 18

U.S.C. § 3553(a) considerations, reflect unsound judgment, or that a different sentence is appropriate regardless.  *Rita v. United States*, 127 S. Ct. 2456, 2465, 2468 (2007). Although courts must give consideration to the guidelines as one of the 18 U.S.C. § 3553(a) factors, they cannot simply defer to policy decisions of the United States Sentencing Commission.  *Rita*, 127 S. Ct. at 2463, 2465, 2468; *Gall v. United States*, 128 S. Ct. 586, 594–95 (2007).  Sentencing courts may disagree with a particular guideline on policy grounds, and may impose a non-guideline sentence because the guideline provision itself lacks basis in empirical data or study. *Kimbrough v. United States*, 128 S. Ct. 558, 566–69, 574–75 (2007).

The *Koon* case is critical to the issue of whether the enhancement under U.S.S.G. § 3A1.4 should apply to Mr. Lefey.  In *Koon*, the United States Supreme Court directed their attention to the history of the Sentencing Guidelines in authorizing certain types of departures, "[t]he Commission promulgated the United States Sentencing Guidelines, which 'specify an appropriate [sentencing range] for each class of convicted persons' based on various factors related to the offense and the offender."  United States Sentencing Commission, Guidelines Manual ch. 1, pt. A p. 1 (Nov. 1995) (1995 USSG). Cited in *Koon v. United States* 518 U.S. 81, 92 (1996).  It should be noted that the *Koon* decision came out in the same year, 1996, as did the amendments to U.S.S.G. § 3A1.4 that are at issue in this case.

According to the *Koon* court,

Acknowledging the wisdom, even the necessity, of sentencing procedures that take into account individual circumstances, *see* 28 U.S.C. § 991(b)(1)(B), Congress allows district courts to depart from the applicable Guideline range if 'the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines

that should result in a sentence different from that described.' 18 U.S.C. §
3553(b). To determine whether a circumstance was adequately taken into
consideration by the Commission, Congress instructed courts to "consider
only the sentencing guidelines, policy statements, and official commentary
of the Sentencing Commission.

*Koon v. United States* 518 U.S. 81, 92-93 (1996).

*Koon* treats the Sentencing Guidelines as "carving out a heartland, a set of typical

cases embodying the conduct that each guideline describes." *Id* at 93.  In order to

determine which cases fall outside the proverbial "heartland," *Koon* explains that there

are several types of factors that come into play when a district court is deciding whether

or not to depart from the Guideline. There are certain factors that *Koon* explains can

"never be bases for departure."  *Id*.  These factors are race, sex, national origin, creed,

religion, socio-economic status, drug or alcohol dependence, and economic hardship.  *Id*.

citing, 1995 U.S.S.G. §§ 5H1.10, 5H1.12, 5H1.4 and 5K2.12.

With the exception of the above listed factors, *Koon* held that the Sentencing

Commission, "does not intend to limit the kinds of factors, whether or not mentioned

anywhere else in the guidelines, that constitute grounds for departure in an unusual case."

*Id*., citing 1995 U.S.S.G. Ch. 1, pt. A, intro. Comment.4(b).  The Commission, according

to *Koon*, gives two reasons for its approach,

> First, it is difficult to prescribe a single set of guidelines that encompasses
> the vast range of human conduct potentially relevant to a sentencing
> decision. . . . Second, the Commission believes that despite the courts'
> legal freedom to depart from the guidelines, they will not do so very often.
> This is because the guidelines, offense by offense, seek to take account of
> those factors that the Commission's data indicate made a significant
> difference in pre-guidelines sentencing practice.

*Id* at 93-94.

Based upon the Supreme Court's reading of the Commission's treatment of

departure factors, the Court explained that a sentencing court considering a departure

should ask the following questions,

> 1) What features of this case, potentially, take it outside the Guidelines'
> "heartland" and make of it a special, or unusual, case?
> 2) Has the Commission forbidden departures based on those features?
> 3) If not, has the Commission encouraged departures based on those
> features?
> 4) If not, has the Commission discouraged departures based on those
> features?

*United States* v. *Rivera*, 994 F.2d 942, 949 (CA1 1993).

Koon was dealing with the issue of departures for sentences of two officers

convicted of the beating of Rodney King.  The potential for abuse in prison was of

particular concern because the defendants were police officers and nationally known for

their actions in the Rodney King case.  A court must determine, under the above-

mentioned test, whether the misconduct that "occurred in the particular instance suffices

to make the case atypical." *Koon*, 518 U.S. at 100.

Cases considered outside the heartland of the guidelines include *United States v.

Mandhai*, 375 F.3d 1243 (11th Cir. 2004).  Although the Eleventh Circuit overruled the

district court's downward departure based upon the defendant having committed

"inchoate crimes," the court remanded the case to the district court to consider a

departure under *Koon,* "[w]e agree with the district court, however, that the 12 level

increase to Mandhai's offense level required by the terrorism enhancement prevents the

penalty from fitting the crime, based on the facts of this record.  The totality of the

circumstances in this record, along with other factors that might not have been brought to

the Court's attention because he granted a downward departure, may be sufficient to

remove the case from the Guidelines "heartland." *Mandhai*, 375 F.3d at 1249.  The basis

for a departure, according to the Eleventh Circuit, was that the defendant was a teenager who consistently had second thoughts about the jihad conspiracy. *Id*. at 1250. Moreover, despite considerable reservations about furthering the conspiracy, the defendant was pressured to continue by two other members. *Id*. Finally, the court noted that the defendant had discontinued his activities with the conspiracy; the court finding "no record of any action by Mandhai between May 2001 and his indictment a year later." *Id*.

Mr. Lefey's case is far outside the guidelines' "heartland." His actions resulted in the loss of trees—the bulk of which were fast growing and had strong rooting and sprouting hormones. No one was ever in danger of physical harm. Unlike his co-conspirators, (with the exception of Aaron Ellringer) Mr. Lefey had not involved himself in much more risky direct actions, such as arson. Mr. Lefey's only direct action occurred in Rhinelander. His life before that time was peaceful and no different from many youths born and raised in the Southwest. And, after only one direct action, Bryan ended his involvement with such behavior.

Additionally, a finding of U.S.S.G. § 3A1.4 carries with it a strong possibility of abuse in prison. The Bureau of Prisons has special housing units for designated "terrorists." The living conditions are solitary, with little to no contact allowed with the outside world. Inmates are generally allowed a single hour of time outside their cell once a day. While this is not necessarily an outcome for Mr. Lefey, the possibility does exist.

b.   18 U.S.C. § 3553(a)

Under 18 U.S.C. § 3553(a), a sentencing court is directed to consider seven factors:

1) the nature and circumstances of the offense and the history and characteristics of the defendant;
2) the need for the sentence imposed—
   a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
   b) to afford adequate deterrence to criminal conduct;
   c) to protect the public from further crimes of the defendant; and
   d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
3) the kinds of sentences available;
4) the advisory guideline range;
5) any pertinent policy statements issued by the Sentencing Commission;
6) the need to avoid unwarranted sentence disparities; and
7) the need to provide restitution to any victims of the offense.

After considering these factors, the statute directs a court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2." 18 U.S.C. §3553(a).

i. NATURE OF THE OFFENSE.

Mr. Lefey's offense and role in the offense is adequately covered above. Suffice it to say, the offense was non-violent, did not carry any real potential for harm to occur, and was a result of misguided youthful passion and concern for the natural world and biodiversity.

ii. CHARACTER OF MR. LEFEY.

Bryan has been influenced and impacted by others in various positive and negative ways. More importantly, as evidenced by the wide range of letters on his behalf, Bryan's impact on others—his community and beyond—is immense.

As is often the case, the government, in sentencing arguments, notes that individuals are the sum of all their actions. While in some sense this is true, it simply is much to broad a statement. Certainly, the acts, decisions, failures, etc., that we all experience

shape each of us.  However, who we as individual are at eighteen, nineteen, or twenty-two is not who we are at thirty-one or thirty-seven.  The "sum of all their parts" argument is intended to support the punitive nature of the guidelines and its focus is not the "sum of all their parts," but rather only on the negative acts that place a defendant before a court.

Every one of us has made mistakes and many of these mistakes have resulted in serious consequences.  Any parent raising young children experiences a child's efforts for independence and to test boundaries.  However, a key to parenting is knowing how to appropriately react to a child's recalcitrance and how to impose an appropriate consequence.  The guidelines, in their application, seem to mimic the parent who, for whatever reason, over reacts to the point of alienating the child and doing more damage then good.

Bryan presents as an individual who cares deeply for those around him—not just those he considers his friends.[10]  His performance art, his music, the way he lives his life, are all designed to bring peace and joy to all around him.  Even facing a federal indictment, has not diminished his zest for life.

iii.  MITIGATING FACTORS

The advisory guidelines are "greater than necessary," and the purpose of sentencing is satisfied by a sentence below the guidelines. *United States v. Redemann*, 295 F. Supp. 2d 887 (E.D. Wisc. 2003) (in bank fraud case where guidelines were 18-24 months, court departed downward two levels in part because case outside the heartland and the guideline sentence was "greater than necessary" to satisfy the "purposes" of sentencing

---

[10] This was demonstrated to counsel on Bryan's second trip to Madison, when walking down State Street with him, he was approached by a young woman who recognized him from the Olympia area.  Her excitement in seeing him proved evident.

U.S.S.G. § 5K2.20. "Courts have long recognized that where the sentence called for by the guidelines would result in punishment greater than necessary the court can depart downward." Here, Mr. Lefey is facing a guideline sentence so detached from the actual harm, that it is difficult to comprehend. Armed criminals—individuals who actually put the community in danger because of their lawlessness more often then not face a sentence comparable to Mr. Lefey's. Furthermore, in Mr. Lefey's case, the Court need not worry about him re-offending; he has a history of almost nine years of being actively and positively engaged in the community.

*United States v. Restrepo,* 936 F.2d 661, 667 (2d Cir. 1991), provides that a departure may be justified where "an offense level has been extraordinarily magnified by a circumstance that bears little relation to the defendant's role in the offense. This is very much the case for Mr. Lefey. The monetary damage found by the Court and the enhancement of U.S.S.G. § 3A1.4, magnifies the offense level beyond justification. In *United States v. Stuart*, 22 F.3d 76, 83-84 (3d Cir. 1994), a court may depart where offense level overstates culpability due to external circumstances, even where a defendant's conduct renders him ineligible for an adjustment. The massive jump in the guideline base due to the loss amount and U.S.S.G. § 3A1.4, coupled with the jump from zero criminal history points to a level six, far overstates Mr. Lefey's culpability.

## III. Conclusion

Bryan still has many years ahead of him. He will continue to be a productive member of society. He is capable, friendly, and a hard worker. Realizing the need to punish Mr. Lefey, counsel asks the court to sentence Bryan to one year and one day for his role in the

offense.  Ideally, a timed served sentence would be imposed or a term of probation, but

Mr. Lefey and counsel recognize and understand the constraints the Court operates under.


Respectfully submitted 23 February 2009

Cornia Law, LLC.
Attorney for Bryan Lefey

_____s/Reed Cornia_____
Reed Cornia
State Bar No.: 1038219

1213 N. Sherman Ave, Box 354
Madison, WI 53704
Office: 608.242.0096
Fax: 608.242.0098


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above document was filed electronically on February 23, 2009 with the Clerk of Court using the ECF system which will send notification to filing to:

Attorney Meredith Duchemin
United States Attorneys Office
660 West Washington Ave.
Madison, WI 53701

s/Reed Cornia_____
Reed Cornia